## AFFIDAVIT OF SPECIAL AGENT MICHAEL LIVINGOOD IN SUPPORT OF AN APPLICATION FOR A COMPLAINT AND SEARCH WARRANT

I, MICHAEL LIVINGOOD, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2016.  I am assigned to the Economic Crimes Squad in the FBI's Boston, Massachusetts Field Office.  My duties include investigating money laundering, wire fraud, and internet fraud schemes.  I have participated in the execution of warrants involving the search and seizure of computers, computer equipment, and electronically stored information. Before becoming a Special Agent, I was an Intelligence Analyst for the FBI and supported investigative work on a variety of federal crimes, including crimes against children, transnational organized crime, and money laundering.  I have received specialized training in investigating financial frauds and money laundering.  I hold a master's degree in human services.  As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2.      This affidavit is being submitted in support of applications for:

    (a)    a criminal complaint charging FRANCIS OKAFOR, also known as "Jason Haddon" and "Niro James" ("OKAFOR"), with conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349; and

    (b)    a warrant to search OKAFOR's residence at 316 School Street, Taunton, Massachusetts (the "SUBJECT PREMISES"), as described in Attachment A to the proposed warrant;

because there is probable cause to believe both that OKAFOR violated 18 U.S.C. § 1349 and that the SUBJECT PREMISES contain evidence, fruits and instrumentalities of violations of federal law, including Title 18, United States Code, Sections 371 (conspiracy), 1014 (false statements to a bank), 1028A (aggravated identity theft), 1343 (wire fraud), 1344 (bank fraud), 1349 (attempt

1

and conspiracy), 1543 (forgery or false use of a passport), and 1956 and 1957 (money laundering and conspiracy to commit money laundering) (collectively, the "TARGET OFFENSES"), as described in Attachment B to the proposed warrant.

3.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE THAT FEDERAL CRIMES WERE COMMITTED**

4.      As set forth below, there is probable cause to believe that, between at least May 2018 and the present, OKAFOR, together with others known and unknown, conspired to commit bank and wire fraud, in violation of Title 18, United States Code, Section 1349, through a series of scams—including romance scams—designed to defraud victims into sending money to bank accounts that he controlled in others' names.

5.      To carry out his fraud scheme, OKAFOR used false foreign passports, in others' names but with his own photo, to open multiple bank accounts, and directed victims to send money to those accounts.  OKAFOR, together with others known and unknown, then withdrew the victims' money at bank branches and ATM machines, often making several withdrawals in a single day.

6.      The affected banks—including Bank of America, N.A., J.P. Morgan Chase, N.A., Citizen's Bank, N.A., Santander Bank, N.A., and TD Bank N.A., are all financial institutions within the meaning of 18 U.S.C. § 20.

*Bank Accounts Opened With Fake Passports*

7.      A review of bank records and surveillance photos indicates that from in or about May 22, 2018 through the present, OKAFOR used fake passports to open and use at least 14 different bank accounts in the names of Jason Haddon and Niro James.[1]  On June 18, 2019, OKAFOR also used the Niro James identity to open "Shiv Shakti Export LLC" ("Shiv Shakti") through the Secretary of the Commonwealth of Massachusetts.  He used the business registration for Shiv Shakti and the Niro James passport also open business bank accounts at multiple financial institutions.  The account openings were as follows:

| Names | Financial Institution | Date Opened | Telephone Number Used | Address [2] |
|---|---|---|---|---|
| 1.Jason Haddon | Citizen's Bank | 05/31/2018 | 617-652-6114 | 95 Bridle Path Circle, Apt. 930, Randolph, MA |
| 2. Jason Haddon | Bank of America | 05/22/2018 | 617-652-6114 | 95 Bridle Path Circle, Apt. 930, Randolph, MA |
| 3. Jason Haddon | Santander Bank | 11/20/2018 | 617-652-6114 | 40 Harding Ter., Apt. 1B, Dedham, MA |
| 4. Jason Haddon | TD Bank | 01/22/2019 | 617-652-6114 | 4 Cross St., Salem, MA |
| 5. Niro James 6. Shiv Shakti | Citizen's Bank | 06/28/2020 | 339-244-3585 | 4106 Avalon Dr., Randolph, MA |
| 7.  Niro James 8.  Shiv Shakti | JP Morgan Chase Bank | 06/20/2019 | 617-652-6114 (# used by Haddon) | 4106 Avalon Dr., Randolph, MA |
| 9.  Niro James 10. Shiv Shakti | Bank of America | 12/12/2019 | 978-218-8006 | 4106 Avalon Dr., Randolph, MA |
| 11. Niro James 12. Shiv Shakti | Santander Bank | 06/24/2019 | 339-244-3585 | 4106 Avalon Dr., Randolph, MA |
| 13. Niro James 14. Shiv Shakti | TD Bank | 06/24/2019 | 339-244-3585 | 4106 Avalon Dr., Randolph, MA |

[1] Some entries in the Niro James accounts were inverted and listed in the name of James Niro.

[2]OKAFOR opened some of the accounts in one address and later changed the account's address of record.  For instance, the Haddon Citizen's Bank and Bank of America accounts initially used 1115 Park Street, Stoughton, Massachusetts, 02702, before being changed to 95 Bridle Path Circle, Apt. 930, Randolph, Massachusetts.

8.      In each of the bank account applications, OKAFOR, impersonating Jason Haddon and Niro James, claimed not to be a U.S. citizen.  OKAFOR opened the Jason Haddon accounts using a purported passport from the Kingdom of Lesotho (PP # RA648916), and the Niro James and Shiv Shakti accounts with a purported Kenyan passport (PP # A4630344).  According to bank records, these passports also contained a United States visa.  I have searched United States Department of Homeland Security ("DHS") records, which list all entries by foreign citizens, and I was unable to locate travel or visa records for these passports, which indicates that the passports are fake.

9.      The telephone number listed for one of the James accounts is the same number as the one listed for all of the Haddon accounts.

10.     As explained further below, OKAFOR used these accounts to receive and launder the proceeds of romance, elder, and other fraudulent scams.

11.     I have reviewed bank surveillance photos depicting an individual who accessed each of the above-listed accounts. The photos, some of which are set forth below, all appear to resemble OKAFOR's Massachusetts driver's license photo.



Figure 3.1: Jason Haddon visa – Santander Bank



Figure 3.3: Francis Okafor's Massachusetts Driver's License Photo



Figure 3.2: Niro James passport – Santander Bank

12.     On or about February 23, 2021, Kofi Osei ("Osei"), who is also known as "Paul Proia", "Kenneth Buck", and "Jeffrey Anashe", was indicted in the United States District Court for the District of Massachusetts for making false statements to a bank, wire fraud, and money laundering, in violation of Title 18, United States Code, Sections 1014, 1343, and 1956, respectively.  He was arrested at his home address, 95 Bridle Path Circle, Apt 930, Randolph, Massachusetts.  This is the same address OKAFOR used in connection with the Citizens and Bank of America accounts in the name of Jason Haddon listed in the chart above.

13.     A court-authorized search of Osei's phone revealed numerous messages concerning the accounts described above between Osei and the phone number (617) 412-7732. According to records from T-Mobile, the latter number was assigned to OKAFOR at the time many of the messages were exchanged.  Prior to June 18, 2019, this phone number was registered to a person believed to be OKAFOR's father.  OKAFOR also provided this number when opening bank accounts in his own name.

14.     For example, on or about September 1 or 2, 2019, OKAFOR and Osei exchanged

the following messages, in which OKAFOR messaged the TD Bank account number (ending in

9097) that he opened with the fake passport in the name of Niro James:

OSEI:        **Text me your Touchdown asap**

OKAFOR:  **TD Bank**
          **Acc name: Shiv Shakti export LLC**
          **Acc number: 8258439097**
          **Routing number: 211370545**
          **Swift code: NRTHUS33**
          **Bank address: 421 Lincoln street Hingham, MA 02043**
          **Home address: 55 Barry street Boston MA, 02121**

15.     From my training and experience working money laundering investigations I

know that a "touchdown" account is a bank account that is used as a place to receive or

"touchdown" a wire transfer derived from criminal activity.  Scammers use "touchdown"

accounts to launder proceeds of fraud by either quickly withdrawing cash or sending the funds

on to another account by wire or cashier's check.

16.     Other messages from Osei's phone show that OKAFOR messaged information

regarding the Shiv Shakti/Niro James account at Bank of America to Osei.   For example,

message exchanges on or about January 15, 2020 include the message below:

**Boa**

**Bank address: 525 Washington street Weymouth, MA 02188**
**Acc name: shiv shakti export llc**
**Acc number: 466005860300**
**Routing: 011000138**
**Home address: 4106 Avalon Dr Randolph MA 02368**

17.     In a May 10, 2018 message, OKAFOR sent Osei his alias, Jason Haddon, and an

address of 1115 Park Street, Stoughton, 02702 (which is an address also used in connection with

the Haddon Citizen's Bank and Bank of America accounts).  The message thread runs from on or

about March 13, 2015 until on or about February 24, 2021. Throughout these messages, Osei and

OKAFOR discuss receiving wires and swap account information, and OKAFOR shares his bank

account information for an account in his true name at "First Bank", which I believe based on my

training and experience investigating financial frauds to refer to First Bank Nigeria, as a location

to send and receive money.

*Victim Funds Flowing in and Out of Haddon and James Accounts*

18.     The records of the bank accounts listed above demonstrate that they were used to

receive and launder the proceeds of various frauds.  Each account shows a pattern of incoming

wires and deposits, followed quickly by cash withdrawals.  Records indicate that approximately

$1,170,026 in fraudulently obtained moneys flowed through OKAFOR's "Niro" and "Haddon"

accounts.  Set forth below are a few examples:

**Victim 1 – Virginia Beach, Virginia**

19.     On or about December 6, 2018, the Haddon Santander Bank account received a

$5,500 wire from Victim 1, a 68-year-old woman who lives in Virginia Beach, Virginia.  The

funds were quickly withdrawn in cash over the next five days.

20.     I have interviewed Victim 1, who told me that she met a man online who went by

the name "David Smith".  Smith told Victim 1 that he was an officer in the United States Army

stationed overseas.  According to Victim 1, Smith requested money for, among other things, his

daughter's education, his travel, and his medical expenses.  Victim 1 said that, in order to provide

the funds Smith requested, she sold her house and depleted her retirement savings.  Also, at

Smith's direction, Victim 1 sent funds to other accounts, including an account belonging to KFB

LLC.  Kofi Osei, one of OKAFOR's co-conspirators as described above, opened the KFB LLC account with a fake passport.

### Victim 2 – Chicago, Illinois

21.     On or about April 4, 2019, the Haddon TD Bank account received a $32,000 wire from Victim 2, a 70-year-old deaf woman who lives in Chicago, Illinois.  The funds were quickly withdrawn in cash and through purchases at an auto parts auction over the next five days.

22.     Victim 2 reported to Citibank that she fell victim to a romance scam with a man that she believed was stationed overseas in the United States military and that she liquidated her retirement account as a result of the scam.

### Victim 3 – Bellingham, Washington

23.     On or about October 2, 2018, the Haddon Citizen's Bank account received $13,000 in wires from Victim 3, a 57-year-old from Bellingham, Washington. The funds were withdrawn from the account in cash within a few days of their receipt.

24.     On or about January 1, 2021, I interviewed Victim 3, who reported that he was the victim of an email scam in which he believed he was interacting with representatives of the International Monetary Fund.  In what is known as an "advance fee" scam, Victim 3 believed that he was providing money up front in order to get a greater amount of money at a later date, which never occurred.

### Victim 4 – Broken Arrow, Oklahoma

25.     Between September 16, 2019 and October 9, 2019, the James Citizen's Bank account received $2,275 in wires from Victim 4, a 53-year-old man from Broken Arrow, Oklahoma.  The funds were withdrawn in cash within a few days of being deposited into the account.

26.     On or about February 4, 2021, I interviewed Victim 4, who reported that he had

sent the money to the James account as the result of a finance scam.  According to Victim 4, he

was looking to refinance an office building he owned.  Victim 4 began communicating with

persons claiming to be Luis Gonzalez and John Rinne at a company named Anchor Investments

USA LLC.  Rinne told Victim 4 that he needed to pay an application fee, closing fees, and

mortgage insurance up front and to send the funds to the James' Citizen's Bank account.  At

some point, Victim 4 contacted Gonzalez, who claimed to be Rinne's manager.  Gonzalez stated

that Rinne had been fired but requested that Victim 4 pay more upfront fees.  Victim 4 at that

point feared he had been scammed and requested that his money be returned, but he never

received a response or a refund.

### Victim 5 – Altamount, Kansas

27.     On August 14, 2019, the James Niro' Santander account received a $25,000 wire

from Cynda Lavender, a 56-year-old woman from Altamont, Kansas.  The bank's records show

that these funds were withdrawn from that account by cash withdrawals within a few days of

their receipt.

28.     On or about February 12, 2021, I interviewed Victim 5, who reported the

following:  After her husband died from cancer, she was lonely and joined online dating sites in

hopes of meeting someone.  She met a man on one of these services named "Anderson Helmut",

who claimed that he lived in Oklahoma but was in South Africa on a diamond expedition.

Helmut claimed that the expedition ran into problems and began asking Victim 5 for money to

help him with acquiring diamonds.  Helmut introduced Victim 5 to others, who furthered the

story and also asked for funds on Helmut's behalf.  Helmut told Victim 5 that any funds she sent

would be repaid.  Victim 5 sent a total of approximately $120,000, including the $25,000 to the

Santander James account.  She funded these payments in part with a $60,000 loan, using her two vehicles as collateral, which Helmut advised her to take out.   She was devastated by the scam, and it has left her financially vulnerable.

### PROBABLE CAUSE TO BELIEVE THAT THE SUBJECT PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

29.      There is also probable cause to believe, for the reasons stated above and below, that OKAFOR's residence, the SUBJECT PREMISES, contains fruits, evidence, and instrumentalities of the TARGET OFFENSES.

30.      OKAFOR listed the SUBJECT PREMISES with the Massachusetts Registry of Motor Vehicles as his home address and owns a vehicle registered to this address.  OKAFOR owns a .45 caliber firearm, which he purchased in October 2020 using his Massachusetts firearms license, which is registered at the SUBJECT PREMISES.  According to Northern Bristol County Registry of Deeds, OKAFOR purchased the SUBJECT PREMISES in or about April 2020.  OKAFOR is believed to live at the SUBJECT PREMISES with a girlfriend and a child.

31.      According to T-Mobile records, as of August 20, 2021, telephone number 617-412-7732 was still assigned to OKAFOR.

32.      Based on my training and experience investigating financial crimes, I know that locations occupied by a target often contain evidence that will aid in establishing the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the government to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

33.     I am also aware, based on my training and experience, that individuals engaged in money laundering often retain records related to stolen or falsified identities. This is because identities can be used more than once at different banks, as OKAFOR did in the investigation described above, opening several accounts under each identity.  Even months after a fraud has been committed, identifications may be retained for use in new or ongoing frauds.

34.     Funds in the James JP Morgan Chase account were accessed as recently as February 2021, suggesting that records, documents, and communications regarding the Target Offenses may exist and be maintained in physical or digital format.

35.     I am also aware, based on my training and experience, that individuals engaged in money laundering and financial frauds retain records of accounts they have opened in furtherance of those frauds. Among other reasons, participants in a fraud do not always appreciate the incriminating nature of records that banks provide in the ordinary course of business.  Bank records show that OKAFOR conducted hundreds of bank transactions, each of which produced receipts and other records.  Although subjects may make efforts to destroy or eliminate such records, it is reasonable to believe that some are retained intentionally, or by accident.  Participants in a fraud also need to be able to document the proceeds of the fraud to show a scheme's net proceeds and the resulting amounts due to coconspirators.  As with the false identifications, bank accounts (and the records they generate) can be used over long periods of time in connection with several financial transactions.  In addition, individuals who perpetrate fraudulent schemes and/or launder the proceeds also keep ledgers of proceeds, similar to drug traffickers, that often are found where they reside.

36.     Finally, I know based on my training and experience as an investigator, that even if they fail to keep written or electronic records of their activities, individuals involved in

11

financial fraud and money laundering activities are unlikely to destroy clothing that they wore when conducting bank transactions.

37.     Accordingly, there is probable cause to believe that the SUBJECT PREMISES, where OKAFOR has lived while committing some of the TARGET OFFENSES, will contain evidence, fruits, and instrumentalities of the TARGET OFFENSES, including, without limitation, clothing matching clothing worn in surveillance images and videos; passports and other identification documents in OKAFOR's name and in the names of others that OKAFOR used to open bank accounts; bank account opening documents, monthly statements, debit cards, ATM receipts, and other banking materials related to the OKAFOR and the TARGET OFFENSES; ledgers and passwords associated with the fraudulent accounts; computers and telephones used to communicate with co-conspirators and victims; and cash.

38.     As discussed below, I also expect that cellular phones and/or computers owned and used by OKAFOR will contain evidence of the TARGET OFFENSES.  As described above, OKAFOR regularly used a cellular telephone to communicate with at least one co-conspirator, Osei, between 2015 and late February 2021, to share "touchdown accounts" and to manage the complexities of the TARGET OFFENSES.  In my training and experience, cellular phones and computers are typically found where targets reside.  Further, targets tend not to discard computers and cellular phones, and even if they do, targets frequently "backup" their computers and cellular phones to new devices, the cloud, or external hard drives, and they keep those records for the reasons stated above.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

39.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by

communicating about them through email, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

40.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

41.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone").  The percentage of adults that own a smartphone is even higher among younger demographic groups:  96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

42.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

> a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

> b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

> c.     Wholly apart from user-generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

> d.     Similarly, files that have been viewed over the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session

15

times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein

16

may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

43.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.      The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the

18

system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

44.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

45.      The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular

device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

## *UNLOCKING A DEVICE USING BIOMETRIC FEATURES*

46.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

47.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (5) five unsuccessful attempts to unlock the device via Touch ID are made.

48.     The passcode that would unlock the devices found during the search of the Subject Premises is not currently known to law enforcement.  Thus, it may be useful to press OKAFOR's finger(s) to the device's fingerprint sensor or to hold the device up to his face in an attempt to

unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

49.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of OKAFOR to the sensor of electronic devices described in Attachment B to the proposed warrant, or to place the devices in front of OKAFOR's face for the purpose of attempting to unlock the device in order to search their contents as authorized by this warrant.

## CONCLUSION

50.     Based on the information described above, there is probable cause to believe that OKAFOR committed conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349, and that evidence, fruits, and instrumentalities of that crime and the other TARGET OFFENSES set forth above, as described in Attachment B to the proposed search warrant, are contained within the SUBJECT PREMISES as described in Attachment A to the proposed search warrant.



_____
MICHAEL LIVINGOOD
Special Agent, Federal Bureau of Investigation


~~Subscribed and~~ sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this 23rd day of  August,  2021.                    4:35 p.m.

Hon. David H. Hennessy
United States Magistrate

21